## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| 300 WEST END AVE. ASSOCIATES ) <br> CORP.; GENERAL THEOLOGICAL ) <br> SEMINARY OF THE PROTESTANT ) <br> EPISCOPAL CHURCH IN THE ) <br> UNITED STATES; and 293-299 ) <br> KNICKERBOCKER LLC, individually ) <br> and on behalf of all others similarly ) <br> situated, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> PLYMOUTH ROCK ENERGY, LLC, ) <br> ) <br> Defendant. ) | Civil Action No. _2:22-cv-03664_ <br><br> JURY TRIAL DEMANDED |

---

### CLASS ACTION COMPLAINT

Plaintiffs 300 West End Ave. Associates Corp. ("300 West End"), General Theological Seminary of the Protestant Episcopal Church in the United States ("GTS"), and 293-299 Knickerbocker LLC ("Knickerbocker") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, and alleges as and for its Class Action Complaint (the "Action") against Defendant Plymouth Rock Energy, LLC ("Defendant" or "Plymouth"), upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigation made by its attorneys, as follows:

### NATURE OF THE ACTION

1.      This action seeks to redress Defendant's deceptive and improper pricing practices that have caused thousands of customers to pay considerably more for their energy services.

2.      For decades, the prices paid by customers for their electricity and natural gas

services were strictly regulated.  However, in recent years, state legislatures have opened energy markets to companies like Defendant (called energy service companies, or "ESCOs"), whereby customers could choose from a variety of companies selling energy services in additional to traditional utilities.

3.     An unintended consequence of the opening of energy markets is that some ESCOs, such as Defendant, have taken advantage of deregulation to charge customers unfair energy rates. For that reason, various states, including New York, have enacted legislation to curb pricing abuses by ESCOs.  New York has adopted the Energy Services Customers Bill of Rights, N.Y. General Business Law § 349-d (the "ESCO Bill of Rights"), which mandates that ESCO contracts and marketing materials clearly and conspicuously identify all variable charges included as part of an energy plan.

4.     Defendant violates the ESCO Bill of Rights by charging customers an exorbitant variable rate initial contract term but failing to clearly and conspicuously disclose the variable charge pricing in the contract.  This practices violate New York's ESCO Bill of Rights.

5.     Further, Defendant's charging customers an exorbitant variable rate after the initial contract term constitutes a breach of contract, as Defendant's contracts expressly provide that the contract shall continue "on the same terms" after the initial contract terms, meaning on the same rate as the initial contract terms.

6.     A class action is the only way Defendant's customers can remedy Defendant's wrongdoing, as the loss suffered by each customer is small compared to the colossal task of challenging Defendant's unlawful practices, and it is thus untenable for individual customers to bring their own lawsuits.  In addition, many customers may not even realize that they are victims of Defendant's conduct.

7.     Plaintiffs bring this action on behalf of themselves and classes of Defendant's customers similarly harmed and described below.  Plaintiffs seek, *inter alia*, actual damages, statutory damages, treble damages, declaratory and injunctive relief, restitution, disgorgement, and attorneys' fees and costs.

## PARTIES

8.     Plaintiff 300 West End Ave. Associates Corp. is a corporation organized under the laws of New York with its principal office in New York, New York.

9.     Plaintiff General Theological Seminary of the Protestant Episcopal Church in the United States is a religious institution organized under the laws of New York with its principal office in New York, New York.

10.     Plaintiff 293-299 Knickerbocker LLC, is a limited liability company organized under the laws of New York with its principal office in Brooklyn, New York.

11.     Defendant Plymouth Rock Energy, LLC is a corporation organized under the laws of New York with its principal office in Woodmere, New York.

12.     Defendant was founded in 2004 and supplies electricity and/or natural gas services to customers in Illinois, Maryland, New Jersey, New York, Ohio, and Pennsylvania.

13.     Defendant is a wholly-owned subsidiary of ENGIE North America, Inc., which is owned by French energy company ENGIE SA.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class are citizens of States different from Defendant.

15.    This Court has general personal jurisdiction over Defendant.  Defendant is a corporation organized under the laws of New York with its principal office in New York, New York.

16.    Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**The Business of ESCOs**</u>

17.    Beginning in the 1990's, many states across the United States began to deregulate their retail energy supply markets, allowing customers to purchase natural gas and electricity through an ESCO instead of through a traditional utility.

18.    Deregulation was designed to increase competition between energy suppliers in the open market by allowing customers a choice of energy suppliers, in turn lowering rates for customers.

19.    ESCOs play a middleman role, as ESCOs purchase energy from an energy company, and then sell that energy to the customer.  However, ESCOs do not deliver energy to customers, as the energy is delivered by the customer's utility.  ESCOs merely buy and sell gas and electricity and then sell that energy to customers with a mark-up.

20.    Thus, ESCOs are essentially brokers, as they neither produce nor deliver gas or electricity, but merely buy energy from a producer and re-sell it to customers.

21.    Because of their flexibility, ESCOs can offer alternative rates that may benefit customers from those of a traditional utility.  Further, ESCOs do not have to file or seek approval from state utility regulators for the energy rates they charge customers.

22.    After a customer switches to an ESCO, the customer's energy supply charge –

based either on a kilowatt-hour ("kWh") (for electricity) or therm (for gas) usage – is calculated using the supply rate charged by the ESCO.

23.     Many ESCOs, including Defendant, market to customers an attractive fixed supply charge that is comparable to, or below, the traditional local utility rate.

24.     However, the fixed supply charge is generally only for a specified term (for example, 12 months), at which point the supply charge will convert to a month-to-month variable charge.

25.     The variable rates charged by ESCOs are generally always substantially higher than both the fixed rate offering and the rates charged by the traditional utility.  Further, the methodologies by which ESCO calculate the variable rates are often not disclosed to customers in the contract, or to the extent they are disclosed, the details are vague and do not parallel the actual charges on the bill.

26.     In short, during the variable month-to-month period during the initial contract term, ESCO customers are often charged outrageously high energy rates detached from market conditions that no reasonable customer would ever agree to, yet the customer is not provided any notice of the change to the variable month-to-month rate (or, often, the manner in which the variable rate is calculated by the ESCO).

27.     As a result, many state Legislatures have enacted safeguards to protect customers from the predatory practices of ESCOs.  For example, the New York Legislature has enacted the "ESCO Bill of Rights," N.Y. General Business Law § 349-d, effective January 11, 2011.

28.     In an effort to curb abuses by ESCOs in charging exorbitant variable month-to-month rates, the ESCO Bill of Rights provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges

shall be *clearly and conspicuously* identified." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added).

29.    The ESCO Bill of Rights further provides that "any contract for energy services which does not comply with the applicable provisions of this section shall be void and unenforceable as contrary to public policy." N.Y. Gen. Bus. Law § 349-d(8).

**Plymouth's Contracts with Customers**

30.    Defendant provides form contracts to customers for the supply electricity and/or natural gas for a fixed-term period which contain the following terms in the "Customer Disclosure Statement" section:

### Customer Disclosure Statement

| Price | Fixed, NYMEX+ or Variable rate per therm/CCF |
|---|---|
| How the price is determined | Dual Bill Monthly NYMEX settlement price of  $0.01700 per therm/CCF. |
| Length of the agreement and end date | 12   months beginning with the first Meter Read on or after  8/1/2016 |
| Amount of Early Termination Fee and method of calculation | No early termination fee for variable service. If fixed or NYMEX+ service, the projected amount of the commodity to be consumed by Customer for the remainder of the current Term multiplied by the difference between the fixed price in effect for the remainder of the current Term and the price at which Plymouth can sell such gas following the termination. |
| Amount of Late Payment Fee | Customer will pay 1.5% on overdue balances not received by Plymouth within 15 days of the date of the bill. |
| Provisions for renewal of the agreement | Upon completion of the Initial Term, this Agreement will automatically renew on a month to month basis at the same terms unless Plymouth obtains customer's authorization after customer has received written notification of any proposed changes to such terms at least 45 days but no more than 90 days prior to the renewal date (the "Renewal Term"). Customer shall retain the right to renew, terminate or renegotiate this Agreement prior to the anniversary date of the renewal period. |
| Guaranteed Savings | This agreement offers no guaranteed savings |
| Consolidated Billing | Plymouth supply charges will be presented on the utility invoice. |

31.    The Customer Disclosure Statement is a part of the contract that Defendant enters into with its customers and is meant to summarize the key provisions of the contract for its customers.

32.    The Customer Disclosure Statement lists three potential price structures in the section entitled "How the price is determined": fixed, NYMEX+, and the "Variable rate per therm/CCF."

33.    Each contract will specific a specific length of the term (included in the section entitled "Length of the agreement and end date"); elsewhere this term is defined as the "Initial Term."

34.    In addition, each contract describes what will happen when the term ends. As set

6

forth in the "Provisions for renewal of the agreement," Defendant's contract provides that "[u]pon completion of the Initial Term, this Agreement will automatically renew on a month to month basis at the same terms….". (emphasis added).

35.    In other words, when a customer reaches the end of the Initial Term, *every* term will remain the same with the lone exception of the length of the contract, which will renew on a month-to-month basis.

36.    However, a different section of the contract titled "General Terms and Conditions," contradicts the "Customer Disclosure Statement." Specifically, the "General Terms and Conditions" reveals that the month-to-month renewal will use "the same terms *except* the rate will be a variable monthly rate…":

> **2. Term.** This Agreement shall commence as of the date Customer's notice regarding the change of Customer's provider to Plymouth is deemed effective by the LDU, and shall continue for _12_ months beginning with the first Meter Read on or after _8/1/2016_ , (the "Initial Term"). Upon
>
> completion of the Initial Term, this Agreement will automatically renew on a month-to-month basis at the same terms, except the rate will be a variable monthly rate, unless Plymouth sends Customer written notice of proposed changes to such terms in advance of the renewal date (the "Renewal Term"). Any such written notice will be sent at least 45 days and no more than 90 days prior to the renewal date, apprising customer of any proposed changes in the terms and conditions of this Agreement and of the Customer's right to renew, terminate or renegotiate this Agreement. While receiving service on a month-to-month basis, Customer or Plymouth may cancel or terminate this Agreement so long 30 days' advance written notice of termination is provided to the other party.

37.    The contract, which was drafted solely by Defendant, contradicts itself by promising on the one hand to apply the "same terms", which includes the same rate, on a month-to-month basis while on the other hand promising to apply the "same terms except the rate will be a variable monthly rate…" The rate that a customer will be charged is a material term to the contract, likely the most material term to a customer, and yet the contract discloses contradictory

rates.

38.     Defendant's contract fails to clearly and conspicuously identify the variable rate to be charged to customers upon the conclusion of the initial term, again other than to commit to it being "at the same terms."

39.     Despite the fact that the contract provides that any renewal period shall be on the same terms, and that, in any event, the variable rate is not clearly and conspicuously disclosed in the contract, Defendant charges its customers a variable rate upon the conclusion of the initial term.

40.     The variable rates charged by Defendant to customers upon the conclusion of the initial term are significantly higher than both the fixed-price rate and the rate charged by the traditional utility.

41.     Defendant provides no transparency on its billing statements to customers as to how the rate charged following the initial term is calculated.  The variable rate is broadly and ambiguously described by Defendant as "the cost of electricity obtained from all sources (including energy, capacity, settlement, ancillaries), related transmission and distribution and other market-related factors, plus all applicable taxes, fees, charges or other assessments and Plymouth's costs, expenses, and margins)," and there is no indication, or detail of how, if at all, that this differs in any material manner from the fixed rate pricing.

42.     The actions of Defendant as described herein violate the spirit and letter of Section 349-d, as the law is explicitly designed to protect energy customers and allow them to make informed decisions when deciding whether to switch to an ESCO.  Defendant's actions do the exact opposite. While the language of the contract presents an overall impression to the customer that there will be a fixed price for the duration of the relationship, not just the contract term, in

8

practice the billing reflects a variable form of billing that is not supported by the contract, and clearly violates Section 349-d (7):

> "In every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be clearly and conspicuously identified".

**Facts Regarding 300 West End**

43.     300 West End is a residential housing cooperative (or "co-op") which owns the building located at 300 West End Avenue, New York, New York 10023.

44.     On or about July 14, 2016, 300 West End contracted with Defendant for Defendant to supply gas service to the building.  The service start date was August 1, 2016.

45.     300 West End satisfies the definition of a "customer" under N.Y. General Business Law § 349(d), as it is a person who is sold or offered an energy services contract by Defendant, who is an ESCO, for residential utility service.

46.     300 West End entered into the contract with Defendant through its agent and authorized property manager, Douglas Elliman Property Management.  The gas service was furnished by Defendant for the benefit of 300 West End and 300 West End paid directly to Defendant all costs of the service.  Defendant was aware at all relevant times that 300 West End was the customer for the gas service and that Douglas Elliman Property Management was serving as 300 West End's agent and authorized property manager.

47.     A copy of the contract between 300 West End and Defendant is attached hereto as "Exhibit A" and incorporated by reference herein.  Upon information and belief, the contract is a uniform contract that Defendant has drafted and used for all customers with materially the same terms.

48.     Pursuant to the contract, Defendant agreed to provide 300 West End gas service at a fixed-price rate of the NYMEX cost plus $0.017 per therm/CCF.

49.     The contract is for an initial term of 12 months, and provides that upon conclusion of the 12 month term, "this Agreement will automatically renew on a month to month basis <u>at the same terms</u>….".  The "same terms" include the fixed-price rate of the NYMEX cost plus $0.01700 per therm/CCF.

50.     The contract fails to clearly and conspicuously disclose that 300 West End would be charged a variable rate upon the conclusion of the 12 month term.

51.     Upon conclusion of the 12 month term, without prior notice to 300 West End, Defendant began charging 300 West End a variable month-to-month rate.

52.     The variable month-to-month rate charged by Defendant upon the conclusion of the 12 month term is significantly higher than the original fixed-price rate.  In fact, the variable rates charged by Defendant each month were approximately double the original fixed-price rates, as well as double the rates charged by Consolidated Edison, 300 West End's regular utility provider.

53.     Defendant has not disclosed to 300 West End how its month-to-month variable rates are calculated.

**<u>Facts Regarding GTS</u>**

54.     GTS is a theological seminary located at 440 West 21 Street, New York, New York 10011.

55.     On or about 2013, GTS contracted with Defendant for Defendant to supply gas service to the building.

56.     GTS satisfies the definition of a "customer" under N.Y. General Business Law § 349(d), as it is a person who is sold or offered an energy services contract by Defendant, who is

an ESCO, for residential utility service.

57.     The contract between GTS and Defendant is substantially similar to Exhibit A. Upon information and belief, the contract is a uniform contract that Defendant has drafted and used for all customers with materially the same terms.

58.     Upon information and belief, Defendant agreed to provide GTS gas service at a fixed-price rate. After an initial term, the agreement was to automatically renew on a month to month basis at the same terms. The "same terms" included the fixed-price rate.

59.     The contract fails to clearly and conspicuously disclose that GTS would be charged a variable rate upon the conclusion of the initial term.

60.     Upon conclusion of the initial term, without prior notice to GTS, Defendant began charging GTS a variable month-to-month rate.

61.     The variable month-to-month rate charged by Defendant upon the conclusion of the initial term is significantly higher than the original fixed-price rate.

62.     Defendant has not disclosed to GTS how its month-to-month variable rates are calculated.

**Facts Regarding Knickerbocker**

63.     Knickerbocker is located at 1946 Coney Island Ave., Brooklyn, New York 11223.

64.     Knickerbocker contracted with Defendant for Defendant to supply gas service to the building.

65.     Knickerbocker satisfies the definition of a "customer" under N.Y. General Business Law § 349(d), as it is a person who is sold or offered an energy services contract by Defendant, who is an ESCO, for residential utility service.

66.     The contract between Knickerbocker and Defendant is substantially similar to

Exhibit A.  Upon information and belief, the contract is a uniform contract that Defendant has drafted and used for all customers with materially the same terms.

67.     Upon information and belief, Defendant agreed to provide Knickerbocker gas service at a fixed-price rate. After an initial term, the agreement was to automatically renew on a month to month basis at the same terms. The "same terms" included the fixed-price rate.

68.     The contract fails to clearly and conspicuously disclose that Knickerbocker would be charged a variable rate upon the conclusion of the initial term.

69.     Upon conclusion of the initial term, without prior notice to Knickerbocker, Defendant began charging Knickerbocker a variable month-to-month rate.

70.     The variable month-to-month rate charged by Defendant upon the conclusion of the initial term is significantly higher than the original fixed-price rate.

71.     Defendant has not disclosed to Knickerbocker how its month-to-month variable rates are calculated.

## CLASS ALLEGATIONS

72.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs bring this action on their own behalf and on behalf of the proposed Classes[1]: Plaintiffs bring this action on behalf of themselves and the proposed Nationwide Class:

> All persons in the United States who were charged a variable rate by Defendant after the Initial Term of the contract expired during the applicable statute of limitations period up to and including the date of judgment.

73.     Pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), Plaintiffs bring this action on behalf of themselves and the proposed New York Subclass:

> All persons in the State of New York who were charged a variable rate by

---

[1] Unless otherwise specified, all references in this Complaint to "Classes" or the "Class" refer collectively to the Nationwide Class and the New York Class.

Defendant after the Initial Term of the contract expired during the applicable statute of limitations period up to and including the date of judgment.

74.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed.

75.     Excluded from the Classes are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

76.     This action is properly maintainable as a class action.  The proposed Classes are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. There are questions of law or fact common to all Class Members that predominate over any questions affecting only individual members.  Specifically, the common questions of fact and law include:

      a.   Whether Defendant breached its contracts with Plaintiffs and the Class;

      b.   Whether Defendant violated New York General Business Law § 349 and § 349-d;

      c.   Whether Defendant was unjustly enriched as a result of its conduct;

      d.   Whether Plaintiffs and the Class have sustained damages and, if so, the proper measure thereof;

      e.   Whether, and to what extent, equitable relief should be imposed on Defendant to prevent it from continuing its unlawful practices; and

      f.   The extent of class-wide injury and the measure of damages for those injuries.

77.     The proposed lead Plaintiffs' claims are typical of those of the proposed Class because the proposed lead Plaintiffs' claims are based upon the same facts and circumstances that

give rise to the claims of the other Class Members and are based upon the same predominate legal theories.

78.     The representative Plaintiffs can adequately and fairly represent the Class.  No conflict of interest exists between the representative Plaintiffs and the Class Members because Defendant's alleged conduct affected them similarly.

79.     The Plaintiffs and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution.  In addition, the Plaintiffs' attorneys are competent in the areas of law relevant to the Complaint and have sufficient experience and resources to vigorously represent the Class members and prosecute this action.

80.     A class action is superior to any other available method for adjudicating this controversy.  The proposed class is (i) the surest way to fairly and expeditiously compensate so large a number of injured persons that constitute the Class, (ii) to keep the courts from being inundated by hundreds or thousands of repetitive cases, and (iii) to reduce transactions costs so that the injured Class Members can obtain the most compensation possible.  Accordingly, class treatment presents a superior mechanism for fairly resolving similar issues and claims without repetitious wasteful litigation relevant to this action.

## CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT

## (ON BEHALF OF THE NATIONWIDE CLASS, OR ALTERNATIVELY, ON BEHALF OF THE NEW YORK SUBCLASS)

81.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

14

82.     Plaintiffs and the Class were bound by valid contracts with Defendant for the provision of energy services.

83.     Each of those contracts were for a specified term, upon the conclusion of which, if the contract was not otherwise terminated by either party, the contract would "automatically renew on a month to month basis at the same terms….".

84.     Pursuant to those contracts, Plaintiffs and the Class agreed to pay Defendant's rate, and did so.

85.     However, Defendant breached its obligations under the contract, as Defendant failed upon the conclusion of the initial term to charge a rate on a month-to-month basis at the same rate as the initial term.  Instead, Defendant charged Plaintiffs and the Class a variable rate that was much higher than the rate charged during the initial term.

86.     Plaintiffs and the Class have been damaged as a result because upon the conclusion of the initial term, they paid energy charged that were higher than Defendant was authorized to charge pursuant to the contract.

87.     As a result of Defendant's breaches, Defendant is liable to Plaintiffs and the Class for damages and attorneys' fees and expenses.

## COUNT II

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (ON BEHALF OF THE NATIONWIDE CLASS, OR ALTERNATIVELY, ON BEHALF OF THE NEW YORK CLASS)

88.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

89.     Plaintiffs and Class were bound by valid contracts with Defendant for the provision of energy supply.

90.     Every contract has an implied covenant of good faith and fair dealing in the performance and enforcement of the contract. The implied covenant is an independent duty and may be breached even if there is no breach of the contract's express terms.

91.     Under the contract, to the extent Defendant had discretion to set the variable rate for energy based on energy market pricing, it was obligated to exercise its discretion in good faith.

92.     Plaintiffs reasonably expected that the energy rates would, notwithstanding Defendant's profit goals, reflect the wholesale and retail market prices for energy and that Defendant would refrain from price gouging. Without these reasonable expectations, Plaintiffs and other Class Members would not have agreed to buy energy from Defendant.

93.     Defendant breached the implied covenant of good faith and fair dealing by unreasonably exercising its rate-setting discretion to price gouge and frustrate Plaintiffs' and other Class Members' reasonable expectations that Defendant's variable energy rate would be commensurate with market conditions.

94.     As a result of Defendant's breaches, Defendant is liable to Plaintiffs and members of the Class for damages and attorney's fees and expenses.

<u>**COUNT III**</u>

**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**

**(ON BEHALF OF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)**

95.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

96.     Defendant's contracts with Plaintiffs and the Class provide that the contracts are governed by New York law.

97.     Plaintiffs bring this claim under N.Y. General Business Law § 349 on their own

behalf and on behalf of each member of the Nationwide Class or, in the alternative, the New York Subclass.

98.     New York's consumer fraud statute prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349.

99.     Defendant's marketing and billing practices are consumer-oriented in that they are directed at members of the consuming public.

100.    Defendant has engaged in, and continues to engage in, deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, including:

    a)  Failing to adequately disclose that despite the language of its contracts, Defendant's energy rates will not renew at the same rates upon the conclusion of the initial term, and instead will be at a variable rate;

    b)  Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates a customer's existing utility charges;

    c)  Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit at a dramatically higher price than if the customer were to stay with the local utility;

    d)  Failing to provide customers adequate advance notice of the variable rates it would charge;

    e)  Failing to adequately disclose the variable rate methodology Defendant used to calculate its variable rates to enable customer to potentially compare prices;

    f)  Failing to adequately disclose the conditions that must be present for a variable rate

customer to save money compared to what the customer's local utility would have charged; and

g)   Failing to adequately disclose that it makes substantially higher profits on its variable rate customers than its fixed rate customers even though there is no material difference between the costs Defendant incurs for its fixed rate customers and those its incurs for its variable rate customers.

101.   The aforementioned acts are unfair, unconscionable and deceptive and are contrary to the public policy of New York, which aims to protect customers.

102.   As a direct and proximate result of Defendant's unlawful and deceptive marketing and billing practices, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

103.   Plaintiffs and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law § 349, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

104.   As a result of Defendant's unfair and deceptive practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349.

## **COUNT IV**

## **VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349-D**

**(ON BEHALF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)**

105.    Plaintiffs reallege and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

106.    Plaintiffs bring this claim under N.Y. Gen. Bus. Law § 349-d on their own behalf and on behalf of each member of the Class.

107.    N.Y. Gen. Bus. Law § 349-d(7) provides that "[i]n every contract for energy services and in all marketing materials provided to prospective purchasers of such contracts, all variable charges shall be *clearly and conspicuously* identified." N.Y. Gen. Bus. Law § 349-d(7) (emphasis added).

108.    The terms that Defendant provides to its customers fail to clearly and conspicuously inform customers of Defendant's variable energy rates or other factors affecting Defendant's variable rates.

109.    Defendant has violated Section 349-d(7) and caused financial injury to Plaintiffs and the Class by causing Plaintiffs and the Class to pay more for energy than they would have had they stayed with their previous supplier or chosen a different supplier.

110.    As shown above, Defendant has willfully or knowingly violated Section 349-d.

111.    As a direct and proximate result of Defendant's violation of Section 349-d, the Class has suffered injury and monetary damages in an amount to be determined at the trial of this action.

112.    Plaintiffs and the members of the Class further seek equitable relief against Defendant.  Pursuant to N.Y. Gen. Bus. Law § 349-d, this Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing

19

Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

113.    As a result of Defendant's unfair and deceptive practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, costs and reasonable attorneys' fees and all other relief available under N.Y. Gen. Bus. Law § 349-d.

## COUNT V

### UNJUST ENRICHMENT

**(ON BEHALF OF THE NATIONWIDE CLASS OR IN THE ALTERNATIVE THE NEW YORK SUBCLASS)**

114.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115.    Plaintiffs and the Class Members would not have contracted with Defendant for energy had they known the truth about Defendant's variable energy rates.

116.    By engaging in the conduct described above, Defendant has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

117.    It would be unjust and inequitable for Defendant to retain the payments Plaintiffs and Class Members made for excessive energy charges.

118.    Therefore, Defendant is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Defendant's actions.

**WHEREFORE**, Plaintiffs respectfully requests that the Court:

(a) Issue an order certifying the Class defined above, appointing Plaintiffs as Class representatives, and designating its Attorneys as Class Counsel;

(b)  Find that Defendant has committed violations of the law alleged herein;

(c)  Enter an order granting monetary relief and damages on behalf of the Class;

(d)  Enter an order granting all appropriate relief on behalf of the Class;

(e)  Render an award of compensatory damages, the amount of which is to be determined at summary judgment or trial;

(f)  Render an award of treble damages and/or punitive damages;

(g)  Enter judgment including interest, costs, reasonable attorneys' fees, and expenses; and

(h)  Grant all such other relief as the Court deems appropriate.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.


Respectfully submitted, this the 21st day of June, 2022.

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

*/s/ Victoria J. Maniatis*
Victoria J. Maniatis (NY Bar No.: 2578896)
James R. DeMay *(pro hac vice pending)*
Patrick M. Wallace (*pro hac vice pending*)
Melissa K. Sims (*pro hac vice pending*)
Blake Yagman (NY Bar No. 5644166)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
100 Garden City Plaza
Garden City, NY 11530
Telephone: (800) 530-9800
Email: vmaniatis@milberg.com
Email: jdemay@milberg.com
Email: pwallace@milberg.com
Email: msims@milberg.com
Email: byagman@milberg.com

**STEIFMAN LLP**

*/s/ Michael Steifman*
Michael Steifman, Esq. (MS-8216)
(*admission pending*)
Steven P. Knowlton, Esq. (SK-2429)
STEIFMAN LLP
292 Montauk Highway
South Hampton, New York 11968
Telephone: 718-645-4100
Email: ms@steifmanlaw.com
Email: sknowlton@steifmanlaw.com